Page 182

```
 1                Proceedings
 2   it was just something that I read over
 3   and over again.
 4          So if I eliminated all that stuff,
 5   I just didn't -- I knew that I didn't
 6   knowingly or intentionally plagiarize.
 7   I didn't, you know, take this paper and
 8   try to make it into this.  I knew that I
 9   was upfront and had that out there and
10   exposed from the beginning.  And I
11   actually didn't even know that that
12   would be the paper that they would think
13   that this was most like because there's
14   a bunch of papers written on the exact
15   same thing.
16          And I just feel like, even now,
17   things where they're talking about
18   methods.  Testing methods was
19   specifically used by me because there
20   are so many papers on testing.  There's
21   so many papers on processes.  There are
22   so many papers on procedures that really
23   delve into this topic.  Because it's
24   such a valuable topic, there's a lot of
25   money behind it, that -- I used methods.
```

Page 183

```
 1                Proceedings
 2   And I even put, like, a note that
 3   methods is to refer to my findings on
 4   all of these.
 5          So all-inclusive of all of this
 6   information and all of the rulings
 7   regarding this information, and that is
 8   not specific to processes or tests or
 9   procedures.  Methods was just -- I had
10   to choose one to try and combine them
11   all and that seems to be the best one to
12   use.
13          ▇▇▇▇▇▇▇▇:  And I want to make
14   sure that, in the interest of time, that
15   I'm able to get to the different
16   aspects.  So if I ask for a more
17   specific answer, it's just for that
18   reason.  So to clarify, a sanction was
19   not discussed at that time?
20          DEAN WILLIAMS:  I'm sorry?
21          ▇▇▇▇▇▇▇▇:  A sanction was not
22   discussed at that --
23          DEAN WILLIAMS:  A sanction was not
24   discussed.
25          ▇▇▇▇▇▇▇▇:  Okay.  Thank you.
```

Page 184

```
 1                Proceedings
 2          So my next question is for you,
 3   Ms. Tshudy.  Did you know -- well, you
 4   went into it a little bit, about -- you
 5   were uncertain about what was considered
 6   general and what wasn't considered
 7   general information.  Was that
 8   information provided to you by your
 9   professor?  Was there any guidance on
10   that?
11          MS. TSHUDY:  No.
12          ▇▇▇▇▇▇▇▇:  Okay.
13          MS. TSHUDY:  No, that wasn't.
14          ▇▇▇▇▇▇▇▇:  Thank you.
15          I want to go back to -- there was
16   a point that you made.  I believe it
17   might have been the top of -- you were
18   looking at part 2.
19          DEAN WILLIAMS:  Part 2C.  It's
20   right on the screen.  Right here.
21          ▇▇▇▇▇▇▇▇:  So I'm having trouble
22   understanding -- and I hope someone can
23   explain to me.  I see that -- in the Law
24   Review note that is referencing footnote
25   210, which if we look at the large
```

Page 185

```
 1                Proceedings
 2   notes, 210 is, see Supernote 127.
 3          DEAN WILLIAMS:  Right.
 4          ▇▇▇▇▇▇▇▇:  Then, if you look at
 5   127.
 6          DEAN WILLIAMS:  It's on page 225.
 7          ▇▇▇▇▇▇▇▇:  I noticed that's -- oh
 8   gosh, a specific case, 435.  I don't
 9   have time for blue booking, but it's
10   that specific case.
11          Now, if I look at that part in
12   your paper, the reference is 45 and it's
13   on page -- under right of public access,
14   it's the page right after that.  So
15   that's in reference to 45.  And if you
16   look at what you're referencing on 45,
17   that is the Nycomed case.
18          MS. TSHUDY:  Yes.
19          ▇▇▇▇▇▇▇▇:  And I'm noticing those
20   are not the same sources.  But if
21   someone were to look at the Law Review
22   note and miscite it by looking at it,
23   that could be one explanation.  Can you
24   provide another explanation?
25          MS. TSHUDY:  Sorry.  Can you ask
```



Page 186

```
 1                  Proceedings
 2    that again.  I apologize.  I'm just
 3    having a little hard time tracking.
 4              ▇▇▇▇▇▇▇: No, you're fine.
 5          So a note on the law review
 6    article, it's number 127; and then in
 7    your paper, it is number 45 and they're
 8    inconsistent.  So you're referencing
 9    Nycomed when the original reference is
10    from 435 Federal -- if somebody knows
11    how to say that better than me, please
12    jump in. (Inaudible)
13              ▇▇▇▇▇▇▇: FTC versus Standard.
14              ▇▇▇▇▇▇▇: Okay.  Shoot.  Okay.
15    FTC versus Standard.
16          So that is a miscite by you to FTC
17    Standard.
18          In my head, in my mind, one
19    explanation for how that could happen is
20    if somebody was looking at the list of
21    references -- and I'm only saying that
22    from a point of, as a student in
23    undergrad, I've learned to look up
24    information to find sources in that way.
25          The only explanation that I can
```

Page 187

```
 1                  Proceedings
 2    think of is if somebody was looking at
 3    this and pulling from there and the cite
 4    of it, can you explain what happened?
 5    Was it something different?
 6              MS. TSHUDY:  So most of the work
 7    that I did with the note or, like, when
 8    I was going through the references was
 9    clicking back and forth for the most
10    part, if that makes sense.  Because you
11    can go and you can click, and then
12    sometimes it pops up in the note where
13    it pops up, but then sometimes it pops
14    back down.  So I'm literally thinking
15    that that was a mistake simply from
16    something related to that.
17          And again, I wish I could give you
18    a great example, but I'm completely, you
19    know, open to tell you exactly what I
20    was looking at through -- in LexisNexis
21    not only has you able to jump straight
22    to the case, but it has you jump up in
23    the note and stuff.  And so if I made a
24    mistake like that then -- but, again,
25    that was one of the most obvious cases
```

Page 188

```
 1                  Proceedings
 2    read and everything.
 3          So if I accidentally read her
 4    thing through that, that could be
 5    possible.  But I know that I read
 6    Nycomed, you know, and it was very
 7    obvious what could be taken and directly
 8    drawn from that.  So that could be a
 9    very -- mistake, if that makes sense.
10              DEAN WILLIAMS:  I might be able to
11    help here.  So if we look at this
12    sentence, it says, The definition of
13    judicial documents, as discussed in part
14    2C, is relevant.  Documents which are
15    submitted to and accepted by a court of
16    competent jurisdiction in the course of
17    the adjudicatory proceedings, right.
18          I actually think this is a typo in
19    the Law Review note.  So note 210 refers
20    us to note 127.  So we're going to go
21    back and look at note 127, which is
22    actually in section 2D of Ms. Rogers'
23    paper.  It's on page 225.
24          So if you look at page 225, she
25    talks about Nycomed.  So she's saying,
```

Page 189

```
 1                  Proceedings
 2    The second circuit explains in Nycomed
 3    Inc. versus Glenmark Generics, that the
 4    right of public access allows open
 5    access to judicial documents and
 6    provides information to the public in
 7    hopes of making the courts appear more
 8    legitimate.
 9          Now here's the next footnote.  For
10    the purposes of this note, the
11    definition of judicial documents is
12    particularly relevant because, as the
13    second circuit declared in Lugosch,
14    judicial documents are presumed to be
15    open to public access as described in
16    part 3.
17          So now we're in part 3 on page
18    2 -- help me again.  We were on page
19    2 -- what, 236? So if we go back to page
20    236, right here.  So she just cites back
21    to her own work.  The definition of
22    judicial documents is discussed in part
23    2C -- well, this should say, as
24    discussed in part 2D.  This is a typo
25    that some law review editor missed -- is
```



```
                                        Page 190
 1                 Proceedings
 2    the relevant documents which are
 3    submitted to and accepted by the court
 4    of competent jurisdiction.  So, I
 5    believe following the footnotes, that 2C
 6    there actually refers to part 2D of this
 7    law review article.
 8          Does that make sense?
 9          PROFESSOR BUTLER:  So that makes
10    the cross reference even worse.
11          DEAN WILLIAMS:  I'm just saying.
12          ████████:  My last point of
13    clarification, I guess, more so.
14          So, first of all, I want to
15    acknowledge how difficult it is to go
16    through the semester that you just went
17    through.  I don't know if that's been
18    mentioned yet, but it needs to be
19    mentioned.  And that's incredibly, yeah,
20    it's incredibly hard.  Because we know
21    students experience these different
22    hardships, there are different resources
23    available for students.
24          Now, I know you mentioned that if
25    you thought that you couldn't finish the
```

```
                                        Page 191
 1                 Proceedings
 2    paper, you would have reached out.  You
 3    would have asked.  I want to know,
 4    explicitly, were you aware that -- or I
 5    guess, was an incomplete an option?
 6          Were those resources available for
 7    you to take advantage of?  Because you
 8    listed a lot of different things that
 9    would have warranted support in those
10    ways, so did you know that those were
11    available?  Did you think about using
12    them?
13          MS. TSHUDY:  I thought that the
14    only available option would really just
15    be, you know, just to withdraw from the
16    course completely and lose all my work,
17    which, you know, was a consideration.
18    But again, I did not realize -- looking
19    back, if I had even thought that this
20    was a potential -- then I would have
21    just done that because taking a
22    withdrawal -- or something, not an
23    incomplete, as separate from withdrawal
24    where I literally just wouldn't get
25    credit, would be sad, because obviously
```

```
                                        Page 192
 1                 Proceedings
 2    worked extensively for this course.
 3          But I did not think that
 4    incomplete was possibility.  I did not
 5    know that incomplete was an option.  I
 6    did not know that I could extend it to
 7    ensure, you know, to ensure --
 8          DEAN WILLIAMS:  Ms. Tshudy, can I
 9    ask you a question?  I don't -- I know
10    that -- and ████████ thank you for
11    acknowledging how difficult this has
12    been.
13          In your first year of law school,
14    did you -- were there times when you
15    asked for assistance and were there any
16    classes that you deferred in your first
17    year?
18          MS. TSHUDY:  My legal research.
19          DEAN WILLIAMS:  And at what point
20    did you defer that?
21          MS. TSHUDY:  That's a very good
22    question.
23          DEAN WILLIAMS:  I mean, was it at
24    the very beginning of the semester?  Was
25    it partway through the semester?
```

```
                                        Page 193
 1                 Proceedings
 2          MS. TSHUDY:  Partway through.
 3          DEAN WILLIAMS:  Okay.  Yeah.
 4    Thank you.
 5          ████████:  Just a few simple
 6    questions.  That's all right.
 7          Would you say it's accurate that
 8    you finished this paper in a rush or a
 9    panic, just given that it was turned in
10    late in the semester, that you --
11          MS. TSHUDY:  Yeah, especially when
12    it comes to citations and everything.
13    So his mentioning of me actually
14    submitting it two days late was actually
15    because, oddly enough, if -- my doctors
16    were concerned, obviously, about me
17    being on campus, and that's why I was
18    remote, but I actually had to come onto
19    campus for finals.  And in response to
20    that, I actually got horribly sick
21    because I hadn't been exposed to
22    everything.
23          So in the middle of our two weeks
24    of finals, I spent -- I can look at how
25    many days -- just ████████
```



```
                                       Page 194                                            Page 195
 1            Proceedings                          1            Proceedings
 2  ███████████ And I sent them,                   2  ultimately I even told them that, if I
 3  sadly, pictures.  I told them not to           3  submit this and he says this isn't
 4  look at the bottom just in case, but if        4  acceptable, it's two days late --
 5  they wanted to because I was horribly          5  because he reiterated in a syllabus that
 6  sick.                                          6  there was no extension, like no reason.
 7        So even then, like, my window to         7        So, to me, I was literally just
 8  be able to make sure that there weren't        8  like, well, there's no possible
 9  citation issues or any issues like this        9  extension, so I'm just going to submit
10  crumbled drastically.  And so,                10  it and if he says that I need to appeal
11  obviously, it's not even close -- again,      11  to the deans for a withdrawal and I'm
12  I figured that at most I was just going       12  not going to get credit for the course,
13  to get bad grade because I thought it         13  then that's it, because literally
14  was generic and too many people wrote         14  there's no other option for me.  There's
15  about this.  And I thought, well, this        15  no other way around it.  He solidified
16  is going to be -- but I thought it at         16  that -- I honestly didn't think he was
17  least qualified.  And I thought that my       17  going to accept it and that I was going
18  sources were there and cited and              18  to withdraw from the course.
19  everything.                                   19        So when I submitted it, I didn't
20        And I even talked to -- not             20  have any belief that it would, you know,
21  student services, but I talked to people      21  even materialize.  I just wanted to, in
22  in the other service center across from       22  my mind, make sure that I completed it
23  testing about how -- this is -- that I        23  and, at least, showed him, you know,
24  literally just have no idea what to do        24  that I've always been eager to do the
25  about this paper and stuff.  And              25  work and the work was there and that
```

```
                                       Page 196                                            Page 197
 1            Proceedings                          1            Proceedings
 2  this is just circumstance control.  But        2  so that's why I use resource outlines
 3  again, I didn't even know if I would           3  and stuff.  And so it would make sense
 4  ever be right or graded or anything            4  that, especially when -- there was
 5  because again, it says specifically in         5  confusion as to whether the requirement
 6  the syllabus -- of all the syllabi I've        6  was 20 pages or whether the requirement
 7  ever received, his would be the most           7  was so many words.  And they didn't line
 8  adamant that there's no extensions             8  up, if that makes sense.
 9  beyond that submission date.  So I             9        So when I had so many words, it
10  thought that was like a certainty.            10  was not even nearly 20 pages.  When I
11  ██████████:  Thank you for that               11  had his required amount of words, it was
12  additional context.                           12  not nearly 20 pages.  And I didn't have
13        So in that -- in that setting --        13  time to really clarify this if it was
14  and you've admitted it, more or less, as      14  just that amount of words.  So I was,
15  much -- would you say possible that you       15  towards the end, kind of, like, looking
16  could have copied portions of this paper      16  for additional things that I had
17  into your outline and then accidentally       17  written, you know, and bringing them
18  copied from the outline into the paper        18  over and stuff.  And that would be the
19  without really realizing that that was        19  time that things like that could have
20  the error you were making?                    20  snuck through.  If I didn't see that it
21        MS. TSHUDY:  So again, I                21  was a citation, and not just my own
22  definitely always take an intermediate        22  notes about what I read, and not my own
23  step that should prevent that, which is       23  notes about additional analysis that
24  I would never copy something directly         24  might be able to fit in there, just to
25  from something and put it into my paper,      25  get to that 20 page maximum.
```



Page 198

```
 1                 Proceedings
 2   Because, again, I had succeeded in
 3   doing the word maximum, but I never
 4   expected the word requirement not to
 5   match up with the page requirements.
 6         ▮▮▮▮▮:  Yeah, that makes
 7   sense.  So it seems, then, quite
 8   possible, if not probable, that what
 9   happened here is, essentially,
10   accidental plagiarism.  So had that
11   been -- so had you understood plagiarism
12   to be a strict liability offense, do you
13   think you would have signed the
14   agreement that was presented to you last
15   week?
16         MS. TSHUDY:  No agreement was
17   presented.
18         DEAN WILLIAMS:  Yeah, I didn't
19   draft an agreement because I wouldn't
20   draft that --
21         ▮▮▮▮▮:  Had such an option
22   been presented to you, do you think you
23   would have been likely to agree with
24   that, or would you have felt that that
25   was not an accurate representation of
```

Page 199

```
 1                 Proceedings
 2   what happened?  Had you been told
 3   plagiarism is irrelevant of intent?  We
 4   have found these repeated passages in
 5   your paper and this --
 6         MS. TSHUDY:  Oh, then I definitely
 7   would have agreed.  If it was irrelevant
 8   of intent and it was just based on me
 9   being open to the idea that I made
10   mistakes, I would have definitely
11   agreed.
12         I thought -- I was trying to ask
13   her for -- our conversation, that was
14   rushed, that was like at 4:15 or
15   something on the day that I had to
16   decide by 5:00.  That was literally me
17   trying to ask, like, is it plagiarism
18   apart from mens rea?  Like, is it
19   something that -- because looking up the
20   definition of plagiarism has "knowingly"
21   or "intentionally" and stuff -- or is
22   there room for mistakes?  Does it
23   comprehend mistakes?
24         So if I had known that mistake is
25   still guilty of -- I wouldn't have even
```

Page 200

```
 1                 Proceedings
 2   risked it.  Again, I would have asked --
 3   honestly if it was possible just to take
 4   my entire grade away because it was not
 5   worth betting that I did not make
 6   mistakes.  Obviously, going through
 7   that, I did not have the pride necessary
 8   to say anything like that or to stick to
 9   my guns, so to speak.  That would have
10   been so -- if that is the case, that is
11   heartbreaking right now, because that
12   would be awful.
13         ▮▮▮▮▮:  Thank you for that
14   clarification.
15         PROFESSOR BUTLER:  You have asked
16   to have a witness present.  And he is
17   present.  I understand it's Mr. ▮▮▮
18   ▮▮▮▮.  If you want to call him on
19   any matter, you're welcome to do so.
20   But I think you should be aware that
21   we're really only interested in hearing
22   his testimony if he's going to advance
23   the case.  And if he's not, then there's
24   really little point in wasting his time
25   or ours.
```

Page 201

```
 1                 Proceedings
 2         MS. TSHUDY:  Well, he was just
 3   there if he needs verification about the
 4   reason that I can't necessarily show as
 5   many sources, right now.  Like, for
 6   instance, the big part was, like, the
 7   using Google to show the exact
 8   structure -- not being able because I
 9   lost the history.
10         PROFESSOR BUTLER:  I'm sorry, you
11   lost what?
12         MS. TSHUDY:  The history and
13   cookies on my computer.  Because,
14   ideally -- I actually did two steps --
15   well, I would have done two steps.
16   First, as I had offered previously in
17   that example to Professor Prince, I was
18   more than willing to offer up my history
19   and my -- sorry, I'm just realizing that
20   if what you said is true, then I made a
21   really bad mistake because I would have
22   never even rushed it.
23         So regarding the Professor Prince,
24   that was one of my biggest things
25   that --
```



Page 202

```
 1              Proceedings
 2        PROFESSOR BUTLER:  Let's assume
 3   that you could show us that material.
 4        MS. TSHUDY:  Yeah.
 5        PROFESSOR BUTLER:  What would you
 6   expect that material to demonstrate to
 7   us?
 8        MS. TSHUDY:  Professor Williams
 9   mentioned that it's just -- the
10   organization of the second half of my
11   paper was, you know, a big part of being
12   concerned about this.  And I literally
13   could have showed that's just generally
14   how -- that's literally, just common.
15   Exactly how all these different ads
16   literally line up, lay it out.  He's not
17   the only person, like, anybody who's
18   ever seen me, I literally would click
19   through these things because I'd laugh
20   at them, because I thought they were
21   funny because they thought that I needed
22   somebody to represent me for litigation.
23        But even things as specific as,
24   you know, the civil procedure, rules and
25   everything like that, was even laid out
```

Page 203

```
 1              Proceedings
 2   in these articles.  And the topics were
 3   laid out in the same way.  The only
 4   difference is sometimes they would have
 5   additional topics that they felt like
 6   they would put in their input.
 7        PROFESSOR BUTLER:  The problem
 8   is --
 9        MS. TSHUDY:  This was without
10   these cases, though.  These cases were
11   separate because they were biotech and
12   pharmaceutical cases, which some of them
13   had the same cases, but some of them had
14   different cases.  But they were
15   concerned about the general layout and
16   organization of the paper.  That's
17   directly what I could have brought right
18   in with them.
19        PROFESSOR BUTLER:  And how would
20   that change the proposition?  The
21   proposition is this:  There are
22   paragraphs in your paper which are
23   verbatim from other sources and none of
24   them are cited.  None of them.  That's
25   plagiarism.
```

Page 204

```
 1              Proceedings
 2        How would offering us the
 3   additional material that you're not able
 4   to offer change that outcome?
 5        MS. TSHUDY:  Like you're saying
 6   multiple paragraphs that are verbatim?
 7        PROFESSOR BUTLER:  I'm saying it
 8   didn't come from the Rogers' notes and
 9   it came from somewhere else.  We don't
10   know where else it is because there's no
11   footnote.
12        MS. TSHUDY:  Okay.  Yeah.  So, I
13   mean, that goes back to not realizing
14   how much this was written about and not
15   realizing what qualifies as generic,
16   because if it's something that -- the
17   organization I've read through -- or
18   read through --
19        PROFESSOR BUTLER:  Trisha, nothing
20   generic about that paragraph.
21        MS. TSHUDY:  Okay.
22        (Crosstalk.)
23        MS. TSHUDY:  Are you talking about
24   a specific paragraph or the organization
25   in general?
```

Page 205

```
 1              Proceedings
 2        DEAN WILLIAMS:  Well, let's talk
 3   about -- may we talk about the
 4   organization, Professor Butler?
 5        PROFESSOR BUTLER:  Fine.
 6        DEAN WILLIAMS:  So I'm going to go
 7   back to my pink highlighting, because
 8   what I did in the pink highlighting
 9   of -- this is the note showing exactly
10   where in Ms. Tshudy's paper these things
11   are referenced.
12        And if you go to -- this is the
13   analysis section of the Law Review note,
14   starting on page 236.
15        You can see -- if you wanted to
16   look at Ms. Tshudy's paper -- you can
17   see that starting on page 11, she goes
18   with the first factor.  Here's the
19   paragraph that we were just discussing.
20   Then she goes on turning to the second
21   factor; that's the next thing in
22   Ms. Tshudy's paper.  And then if you go
23   here the next thing, this is the next
24   thing in Ms. Tshudy's paper, Inquiry,
25   often based largely on whether the
```



```
                                          Page 206
 1                  Proceedings
 2     information is germane --
 3           Then we keep going.  This is the
 4     next thing and she -- here she cites to
 5     Momenta in exactly the same way that is
 6     cited to Momenta.  The next thing she
 7     cites to is Nycomed, in exactly the same
 8     order in which Ms. Rogers cites to
 9     Nycomed.
10           The next thing is this reference
11     to Massey Coal in exactly the same order
12     in which Ms. Tshudy refers to Massey
13     Coal on page 14 of her paper.
14           The next thing is -- this whole
15     thing and even this reference to --
16     sorry, I need to look at it again.  This
17     reference, disclosed to the plaintiff
18     several documents marked confidential
19     per the protective order, a few of which
20     demonstrated the defendant needed
21     chemicals, blah, blah, blah.  Exactly
22     word-for-word from the Law Review
23     article.
24           If you go to page 15, starting
25     with that sentence, Ultimately --
```

```
                                          Page 207
 1                  Proceedings
 2     Ms. Tshudy's paper tracks this virtually
 3     word-for-word.  If you go to page --
 4     continue on page 15.  And then she goes
 5     to Massey Coal in exactly the same order
 6     that Ms. Rogers cites to Massey Coal,
 7     uses this same cite on page 16.
 8           On page 17, she starts to talk
 9     about subpoenas here, you know, and then
10     this is also word-for-word, although
11     there is no per se protection for trade
12     secrets under Rule 45, it's likely that
13     the generic manufacturer would be able
14     to withstand disclosure of a biomedical
15     equivalency test in the event of a
16     subpoena.
17           She uses the exact same example,
18     for example, in Fosamax, exact same
19     example as is cited in this Law Review
20     article on page 17, word-for-word, I
21     might add.
22           If you go to page 18, this quote
23     about, We already talked a little bit
24     about this notion of the wider social
25     good, that's on page 17.  And page 18,
```

```
                                          Page 208
 1                  Proceedings
 2     you know, When comparing this case with
 3     a potential disclosure of a -- and she
 4     doesn't use the word bioequivalency
 5     right, but it's there.  And then on
 6     page -- it continues.  Here's the FOIA
 7     stuff.  On page 19, you know, same
 8     thing.
 9           MS. TSHUDY:  Is this -- I
10     apologize.  Is this like a conclusion or
11     are you presenting again?  This is just
12     confusing.
13           DEAN WILLIAMS:  This is just --
14     I'm just showing that the structure of
15     your paper matches the structure of
16     Ms. Rogers' note identically.
17           PROFESSOR BUTLER:  No, what I'm
18     asking is whether your witness can offer
19     any additional light -- cast any
20     additional light on these issues?  If
21     not, then I don't think it's in your
22     interest or ours to hear him.  If
23     there's something, however, that I'm
24     missing --
25           MS. TSHUDY:  I mean, the biggest
```

```
                                          Page 209
 1                  Proceedings
 2     thing is -- yeah, he would be able to
 3     explain the organization structure and
 4     he would be able to verify that
 5     literally the only reason that I can't
 6     pull that up for you exactly is because
 7     of -- now, I've been trying to replicate
 8     my thing to be able to get back to
 9     getting those ads to pop up, but it's
10     just not enough time in comparison to a
11     whole semester searching the same things
12     that got it to pop up those separate
13     articles.
14           PROFESSOR BUTLER:  I understand
15     you correctly -- if your position is
16     that the organizational similarity
17     between your paper and the note can be
18     explained by similar organizational
19     patterns and other things that you read,
20     then you really need to produce the
21     other things.  It's not enough to say
22     that you've read a lot and that there
23     may be other things out there that have
24     identical organization.  Are you in a
25     position to do that?
```



Page 210

```
 1                  Proceedings
 2          MS. TSHUDY:  Somewhat, but I don't
 3   have them right --
 4          ▆▆▆▆▆▆▆:  I apologize for
 5   interrupting.  Can we take a five minute
 6   break?
 7          DEAN WILLIAMS:  Yes, please.
 8          ▆▆▆▆▆▆▆:  I'm so sorry.
 9          DEAN WILLIAMS:  Let me go get some
10   more water for everybody too.
11          PROFESSOR GOULD:  Thank you.
12   Thank you for these.
13          ▆▆▆▆▆▆▆:  Thank you.
14          PROFESSOR GOULD:  Oh, they're
15   cold.
16          DEAN WILLIAMS:  That one's cold.
17          PROFESSOR GOULD:  Wow.
18          DEAN WILLIAMS:  I have un-cold
19   ones.  Does anybody want -- you may
20   close the window if you are chilly.
21          ▆▆▆▆▆▆▆:  I was already --
22          DEAN WILLIAMS:  ▆▆▆▆ was already
23   on it.
24          PROFESSOR GOULD:  Nice background.
25          DEAN WILLIAMS:  This is just
```

Page 211

```
 1                  Proceedings
 2   whatever is.
 3          PROFESSOR GOULD:  That's yours?
 4          DEAN WILLIAMS:  This is just the
 5   law schools.
 6          PROFESSOR BUTLER:  All right.
 7          DEAN WILLIAMS:  This is my snowy
 8   background in anticipation of the
 9   weekend.
10          PROFESSOR BUTLER:  Sorry, I'm
11   trying to shut it off so that doesn't
12   happen again.
13          ▆▆▆▆▆▆▆:  I can silence it for
14   you.  Do you want me to do that?
15          PROFESSOR BUTLER:  Yeah.
16          ▆▆▆▆▆▆▆:  It'd silenced now.
17          PROFESSOR BUTLER:  Thank you.
18   Right.  So the question is now,
19   Trisha, have you thought over what you
20   want to do with your witness?
21          MS. TSHUDY:  If you guys don't
22   have any questions or need any
23   verification, I guess it's not
24   necessary.
25          PROFESSOR BUTLER:  What we're
```

Page 212

```
 1                  Proceedings
 2   faced with at the moment, as I
 3   understand it, is we have questions of
 4   level of use of another piece, another
 5   note.  It's one thing if a paragraph has
 6   been moved.  That's the technical
 7   definition of plagiarism.  It's another
 8   thing if the whole article has been used
 9   organizationally, structurally.  And
10   you're adamant in your testimony that
11   you didn't read it except for the
12   footnotes.
13          MS. TSHUDY:  I didn't read the
14   footnotes.  I used sources from it and I
15   skimmed some of it, but not really.
16          I just want it to be acknowledged
17   that I did not know it was strict
18   liability and I would have never risked
19   such a thing.  And I specifically
20   arranged my 4:15 phone call with Dean
21   Williams to clarify what the level of
22   mens rea requirement was.  And I thought
23   that she was being unbelievably
24   unhelpful in specifying something that
25   she could have just straight told me was
```

Page 213

```
 1                  Proceedings
 2   strict liability.  And had I known
 3   beforehand, that it was strict liability
 4   then from what I went through this
 5   semester, I wouldn't have even submitted
 6   it and even risked this happening.  So
 7   I'm very upset.
 8          PROFESSOR BUTLER:  When you
 9   started law school here, did you sign
10   the honor code?
11          MS. TSHUDY:  Yeah.
12          PROFESSOR BUTLER:  You're aware of
13   what the rules of professional
14   responsibility of this profession are?
15          MS. TSHUDY:  Yes.
16          PROFESSOR BUTLER:  It's strict
17   liability, beginning to end, there is no
18   exception.
19          So I'm assuming that you will not
20   call Travis.
21          MS. TSHUDY:  I don't know if it's
22   necessary.
23          PROFESSOR BUTLER:  I think you're
24   right.
25          Any further questions for anybody?
```



```
                                         Page 214
 1              Proceedings
 2      Yes,
 3             ▇▇▇▇▇: I have two questions.
 4         Professor Gould, what is the harm
 5      that has been done in the situation?
 6      Can you expand on what it is?
 7         PROFESSOR GOULD: What is the
 8      harm?
 9         It's just sad. I don't know what
10      to say. Under the honor code, I felt
11      obligated to report. It's sort of
12      simple as that. It hasn't hurt my life.
13      I mean, I had to drive here 3 hours,
14      but --
15         But the harm -- I mean, in a
16      bigger sense, okay -- in a bigger sense,
17      I also think of my other students here
18      at the law school, this semester and
19      from two years ago, and everyone's
20      really done really hard work, a lot of
21      research and a lot of good writing and I
22      know it's taken a lot of time and
23      effort. And so there's one thing -- I'm
24      watching and when I think about, besides
25      my duty to report my suspicion, I do
```

```
                                         Page 215
 1              Proceedings
 2      think of those students. So there's
 3      sort of a potential harm as long as
 4      those students, in our profession, feel
 5      that things are being addressed. So
 6      that comes to mind.
 7             ▇▇▇▇▇: Thank you.
 8         Ms. Tshudy, hearing what the
 9      potential harm is or what the effect of
10      the harm is and knowing now the
11      definition of plagiarism, what do you
12      think your role would be in mitigating
13      any of that harm?
14         MS. TSHUDY: In mitigating it?
15      I'm not here seeking any, you know,
16      credit or publication or anything
17      spread -- I mean, obviously, even just
18      with finding out this strict liability
19      and everything -- which I probably knew
20      but just didn't fully, like, grasp,
21      especially at the time where I was
22      making the decision of whether to
23      actually submit or not.
24         I won't say that I would ever even
25      attempt, never even attempt to
```

```
                                         Page 216
 1              Proceedings
 2      plagiarize something. But now it's just
 3      like, you know, avoiding it at all
 4      costs. Like even just not even like I
 5      don't even think that I would ever try
 6      using secondary sources again just
 7      because of the risk.
 8             ▇▇▇▇▇: I want to clarify a
 9      little bit. So hearing the effects of
10      the harm that have happened, knowing
11      what has been done and taking, in a
12      sense, an understanding and
13      responsibility, what can you do to
14      repair the harm that has been caused in
15      the situation?
16         MS. TSHUDY: I think that's
17      difficult because, obviously, so to
18      mitigate it, I'm not searching for any,
19      like -- obviously the paper can just not
20      exist. You know what I mean, does that
21      make sense? To mitigate the harm while
22      making sure that I'm not, you know, if
23      there's plagiarism that that's not being
24      spread as my ideas, obviously, would be
25      the first start, you know what I mean.
```

```
                                         Page 217
 1              Proceedings
 2         So obviously just getting rid of
 3      the paper, I guess, would be, like, the
 4      first way to prevent any additional harm
 5      just from the writing alone. I'm trying
 6      to think of who I've really --
 7      obviously, I apologize to everyone that
 8      you even had to come to a hearing today,
 9      but I felt bad for that beforehand. I
10      apologize, Professor Gould, that he ever
11      even was put motion in opposition that
12      he would think that he needed to come to
13      a hearing.
14         If you could specify the harm that
15      you think I've done, this isn't
16      something that I would ever obviously
17      even remotely risk again. So I
18      apologize for taking your Friday away.
19      I don't know if I've done harm to
20      anybody else other than the people in
21      this room and if I have, and you clarify
22      that, I can try to mitigate that for
23      others. 
24             ▇▇▇▇▇: May I jump in just a
25      second? I'm so sorry.
```



Page 218

```
 1              Proceedings
 2        You know, as Professor Gould has
 3   said, plagiarism is an odd crime and
 4   that it's not one that causes a direct
 5   impact necessarily to any one person.
 6   It's a social harm, if you will, a harm
 7   to the community at large.  And so in a
 8   few minutes the board will step away to
 9   deliberate and when we return, if
10   there's been a violation found there'll
11   be an additional discussion of potential
12   sanctions.
13        And I think what ████ is getting
14   at, and what I would very much, like,
15   think would be a wise thing for you to
16   consider at the moment is, if there is a
17   violation found, what you can give back
18   to the community, ways you can lessen
19   that sort of amorphous harm that occurs
20   just from the act of plagiarism because
21   that will be relevant if there are any
22   sections to be found.
23        Just something to think about.
24        MS. TSHUDY:  For certain, one
25   thing is to use this as, you know, just
```

Page 219

```
 1              Proceedings
 2   an experience to be able to share with
 3   anybody I come across because
 4   ultimately -- I mean if I had known the
 5   details like I said I would have never
 6   even --
 7        Like, even though I submitted,
 8   thinking that he wouldn't necessarily
 9   even take it, this past thing.  I would
10   have just told -- expressed to people
11   and can always advise people and say,
12   Hey, this is my story, this is what
13   happened to me and stuff.  And you can
14   have all the good intentions and it's
15   still just not worth it.
16        And I would say that I thought
17   that it was worth it, I just didn't
18   understand or grasp the level.  But --
19   even from the beginning, like I
20   explained to Professor Williams, that
21   I've always advocated for this process
22   and even having this option to come here
23   and being able to go through this and --
24   to be honest I couldn't find anybody who
25   really had or had details on how exactly
```

Page 220

```
 1              Proceedings
 2   operates.
 3        The biggest thing is, in anything
 4   in my life, you know, being able to
 5   share that with people so that they
 6   don't have to make the same mistakes you
 7   do -- or realize the levels that you
 8   have to go to to avoid stuff.  So I feel
 9   like that is incredibly helpful.
10        And one thing that I am not
11   hesitant of to say, in the slightest,
12   because I love especially with -- you
13   don't know me, but particularly, in my
14   life, there's been a lot of things that
15   really -- people -- a lot of really hard
16   lessons just to learn, like, health
17   issues and everything like that, that
18   I've never hesitated the mention, any of
19   my mistakes or any issues with me, if it
20   means that it could help somebody or
21   prevent something for somebody else.
22        So the biggest thing would be, I
23   had already planned on doing a
24   presentation for the law school on
25   service animals because I took
```

Page 221

```
 1              Proceedings
 2   disability loss last semester and found
 3   out that even our disability law
 4   professor doesn't actually know the laws
 5   regarding service animals.  But if given
 6   the opportunity, I'd happily discuss
 7   this with other students as well, to a
 8   tee, to every single detail, every
 9   single mistake that I made just so that
10   they could understand the process.
11        Because honestly I wish I had had
12   somebody else for that, for me, so if I
13   could be that to somebody else then
14   that's completely worth it.  In one way
15   it should probably be fortunate that I
16   learned, at least, lessons -- this now.
17   Because this could probably be prevented
18   in the future.
19        But, obviously, I mean,
20   professional responsibilities, and I was
21   a Bio-Chem background, so I thought
22   they're pretty strict about plagiarism
23   and stuff but generalization and
24   everything -- just even the things like
25   you need to get complete clarification
```



```
                                              Page 222
 1                   Proceedings
 2      from your professor of what would
 3      pertain and stuff like that.  And I
 4      think the open endedness of, you know,
 5      legal writing really did not convey that
 6      properly to students.
 7           And so even if it comes to my
 8      peers explaining that, Hey, probably
 9      best to just stay away from secondary
10      materials if you can, just kind of that
11      thing because that's honestly been
12      something that's been in the discussion
13      which means that there's a lot of other
14      students even at our school alone that
15      don't actually realize this.
16           ▇▇▇▇▇: Can I jump in.  I just,
17      there's something that I really want to
18      address.  First of all, I know that you
19      also had a very hard semester and I also
20      wanted to acknowledge the adversity that
21      you've been through because it is
22      tremendously stressful to have gone
23      through that and it's very commendable
24      that you're here today.
25           But the one thing I also wanted to
```

```
                                              Page 223
 1                   Proceedings
 2      address was that there's something I
 3      think that you're almost getting to but
 4      not quite getting to, which is
 5      accountability.  Which is the fact that
 6      there were parts of your paper that
 7      verbatim, word-for-word, were copied
 8      from another paper.
 9           And when you're answering you're
10      saying, well, part of what I've learned
11      is not to use secondary sources.  But I
12      don't think that that's the moral lesson
13      of why we're here today.  The point is
14      not, not to use secondary sources.  In
15      your grad school career you're going to
16      obviously write lots of papers, use
17      secondary sources.
18           I think the lesson here would be
19      to take accountability and understand --
20      or take time to understand what it
21      actually is that you've done.  And it is
22      like a little bit of a weird crime to
23      plagiarize, because, at first, it can
24      seem I remember learning what it was
25      when I was in high school, in college,
```

```
                                              Page 224
 1                   Proceedings
 2      and it's like, well, who is this really
 3      harming?  Well, it's more actually a
 4      matter of your own integrity and your
 5      own work.  And part of that is doing
 6      your due diligence as a student and
 7      vetting your sources.
 8           And making sure that you are
 9      presenting work because what it
10      essentially is you're trying to pass off
11      work as your own, even though you didn't
12      intend to, even though you say that
13      wasn't your intention -- this paper,
14      when you submitted it, it was an attempt
15      to pass off work that was not your own,
16      and that's where that's the harm, and
17      that's where it comes in.
18           And I just wanted to hear an
19      acknowledgment of that harm, and I know
20      that that is going to mean a lot to the
21      board, especially when they take it into
22      their deliberation.
23           MS. TSHUDY:  No, I agree.  That is
24      incredibly harmful, and again, it's hard
25      to grasp exactly, but -- I guess it's
```

```
                                              Page 225
 1                   Proceedings
 2      hard to -- obviously, I can't even
 3      explain it's a horrible mistake to make,
 4      and I apologize from the depth of my
 5      heart that I would ever make a mistake
 6      like that.
 7           I do feel really terrible, and I
 8      understand that that harm cannot ever
 9      spread or that I cannot ever be seen as,
10      like, even -- no matter the intent or
11      anything.  That makes sense and stuff,
12      and nobody should ever feel that their
13      work could be copied or anything like
14      that.
15           And I'm having a hard time
16      thinking of how I can mitigate it, but I
17      don't want you to think that I do not
18      admit that that's a horrible, horrible
19      mistake to make.  It's, you know, way
20      beyond the level of embarrassing, and
21      it's really shameful and stuff, and I
22      never would have ever wanted to or even
23      risk that.  And I'm really sorry.
24           ▇▇▇▇▇:  I'm not looking for a
25      cookie-cutter answer at all.  So I
```

57 (Pages 222 to 225)



Page 226

```
 1            Proceedings
 2   really just appreciate what you've told
 3   me, so thank you.
 4         PROFESSOR BUTLER:  I think we've
 5   come to the point where we will adjourn
 6   to the room, 124.
 7         DEAN WILLIAMS:  Yes.
 8         PROFESSOR BUTLER:  We will dealing
 9   both with the finding of whether there
10   was a violation or not.  And if there
11   was, we will also discuss sanctions.
12         DEAN WILLIAMS:  I'm going to go to
13   my office, so if you need me for
14   anything, I will be in my office.
15         PROFESSOR BUTLER:  All right.
16         DEAN WILLIAMS:  Okay.
17         PROFESSOR BUTLER:  Should -- she
18   should wait around?
19         DEAN WILLIAMS:  Yes, she should
20   wait.
21         Trisha, you should wait.  You're
22   free to wait in this room.  Understand
23   that the recording is continuing, so if
24   you want to stay in this room,
25   understand that whatever you say will be
```

Page 227

```
 1            Proceedings
 2   recorded.
 3         You certainly are welcome to go
 4   over to the room right here, room 104,
 5   if you'd like to.  You can certainly use
 6   that room.  Let me make sure it's
 7   unlocked.
 8         I'm sorry.  I will.  I will, so
 9   come get me when you're ready to
10   reconvene--
11         Room 104 is open, so you're
12   welcome to use that room.
13         MS. TSHUDY:  So you said that this
14   is the same as the Turnitin?
15         DEAN WILLIAMS:  No, look at the
16   other documents that are attached there,
17   too.
18         MS. TSHUDY:  I just want to make
19   sure this was supplied as well.
20         DEAN WILLIAMS:  Uh-huh.
21         MS. TSHUDY:  Okay.  Good, because
22   that's -- drastic difference.  And I
23   obviously didn't have the Turnitin
24   originally discussed.  So it's drastic
25   difference in the percentages.
```

Page 228

```
 1            Proceedings
 2         (Crosstalk.)
 3         DEAN WILLIAMS:  Turnitin actually
 4   is a little bit more sophisticated.
 5         PROFESSOR BUTLER:  So let us
 6   resume the session.  We have deliberated
 7   on this matter, which we take very
 8   seriously, indeed.  We have found that a
 9   violation of the honor code has
10   occurred.  And we have determined that
11   the following sanctions should be
12   applied.
13         UNKNOWN SPEAKER:  Which violations
14   is technically like 2F instead of 2D
15   because there were two.
16         (Inaudible.)
17         PROFESSOR BUTLER:  Yes.  Violation
18   F, is what we are finding on the basis
19   of, and that is violation of academic
20   and integrity and it includes copying,
21   plagiarism, et cetera.  I won't read the
22   entire sub-point, not all of which is
23   relevant, but those parts that I have
24   mentioned are relevant.
25         Sanctions are to be as follows:  A
```

Page 229

```
 1            Proceedings
 2   written reprimand to be included in the
 3   student's record -- do not underestimate
 4   the implications of that; denial of
 5   credit for the course, with an
 6   appropriate transcript entry; suspension
 7   from nonacademic school activities for
 8   the spring semester 2022.
 9         And two recommendations, first,
10   that you meet with Professor Dodge to
11   discuss the possibilities of advice on
12   mental health.  Professor Dodge is aware
13   of this hearing, and so he will know
14   what you're talking about.  Secondly, a
15   meeting with Professor Titichia Jackson.
16   She is not necessarily aware of this
17   session and will not know what you're
18   talking about, so you can judge your
19   meeting with her accordingly.  What you
20   discuss with her are issues of academic
21   success.
22         Those are the findings of this
23   committee.  Do you have any comments?
24         You have the right of appeal, of
25   course, to the dean.  If there are no
```




Page 230

```
 1              Proceedings
 2   other comments or questions, then this
 3   meeting is adjourned.  Thank you all.
 4         DEAN WILLIAMS:  Thank you,
 5   Professor Butler.
 6         MS. TSHUDY:  Appeal this?
 7         DEAN WILLIAMS:  I'm sorry?
 8         MS. TSHUDY:  Could I maybe appeal
 9   this?
10         DEAN WILLIAMS:  So, under the
11   honor code, if you go to section --
12   chapter 7, shows you the procedure for
13   appeal.  Professor Butler is required to
14   prepare a report, which will be a
15   summary report -- and he has an
16   obligation to provide that, I believe,
17   within seven days -- give me one second.
18         PROFESSOR BUTLER:  Yeah, it's
19   seven days.
20         DEAN WILLIAMS:  So
21   Professor Butler will provide that
22   within seven days.  And then you have
23   seven days from the receipt of the
24   report to appeal to the dean.
25         Thank you, Professor Butler.
```

Page 231

```
 1
 2         PROFESSOR BUTLER:  Need anything
 3   else?
 4         DEAN WILLIAMS:  I do not.  Thank
 5   you.  Thanks.
```

Page 232

```
 1
 2
 3            C E R T I F I C A T E
 4   STATE OF NEW YORK )
 5              : SS
 6   COUNTY OF NEW YORK)
 7
 8         I, Marissa Mignano, a Notary
 9   Public within and for the State of New York,
10   do hereby certify the within is a
11   a true and accurate transcription of the
12   audiotapes recorded.
13         I further certify that I am
14   not related to any of the parties to this
15   action by blood or marriage, and that I am
16   in no way interested in the outcome of this
17   matter.
18         IN WITNESS WHEREOF, I have
19   hereunto set my hand this 6th day of
20   September 2022.
21
22         _____
23             MARISSA MIGNANO
24
25
```



